CLETUS E. DEE, Appellant, v. ROBERT A. COLLINS et al., Appellees.

No. 46829.

APRIL 2, 1946.

Hart & Hart and F. E. Teeling, all of Waukon, for appellant.

H. Haehlen, of Waukon, for appellees.

BLISS, C. J.—I. This is the second appeal to this court in the case. The opinion in the first appeal is in 235 Iowa 22, 15 N. W. 2d 883. On the first trial there was a decree for plaintiff. The defendants, at the close of plaintiff's case, had moved to dismiss the petition. The motion was denied. When defendants began to offer their testimony plaintiff objected on the ground that in moving to dismiss defendants had rested their case and were precluded from offering their defense. The trial was re-

cessed for a few days until counsel could submit authorities. When the trial was resumed defendants asked that the case be reopened to permit the introduction of their testimony. The court refused upon the ground that both sides had previously rested. On that appeal we held that the district court did not err in denying defendants' motion to dismiss, as plaintiff had made a prima facie case entitling him to specific performance, with the exception that interest should have been added to the tender of the purchase price, but reversed because of the court's refusal to permit the defendants to offer their evidence. The case was therefore remanded to permit the offer of such evidence and any rebuttal by plaintiff.

The defenses which defendants sought to prove on the second trial were, first, abandonment of the contract by plaintiff, and, second, that plaintiff was not in court with clean hands in that he had attempted to prevent defendants from perfecting their title to the property and was seeking to acquire title for himself other than by enforcing his contract.

Judge W. L. Eichendorf, who had presided at the first trial, died sometime thereafter. The second trial was heard by Judge Martin M. Cooney but it was agreed that he might consider the testimony received in the first trial.

In the preparation of the record for this appeal the defendants offered twenty amendments to the record submitted by plaintiff. The trial court rejected six of the suggested amendments but permitted the others. Instead of the testimony being properly abstracted, by far the greater part of it is needlessly set out verbatim as it appears in the transcript and contains much repetition and immaterial matter of no aid to the court or to the litigants.

In October 1940 one Gaul held the record title to Lot 5 in Lot 2 in Section 30, Township 98, Range 5, in the city of Waukon, Iowa. It was a rectangular piece of ground, approximately 561 feet long north and south and approximately 107.7 feet wide east and west. The south end of the tract abutted on the north side of Bradley Street and its west side abutted on the east side of Williams Street. The tract was apparently not cross-fenced or subdivided on the ground but the south 183 feet

of it, abutting on Bradley Street, which was paved, had a residence on it.. One Neubauer and wife were living on this part of the tract, under a lease or contract to purchase, in October 1940. On the middle 122 feet of the tract was a bungalow, which plaintiff and family were occupying under a lease at a rental of $17 a month. The north 256 feet of the tract was a vacant lot. The lengths of the three parts as given are but approximations.

The Collins family, consisting of the father and mother, two daughters, Mary and Catherine, and two sons, Robert and Tom, were in the real-estate business as agents or realtors. They had the Gaul tract for sale and for rent. They had leased the middle tract to the plaintiff and he had paid them $50 as rent. The brother and sister, Robert and Mary Collins, are the defendants.

Gaul was involved financially. He and his wife had borrowed $2,200 in 1938 of the Waukon State Bank and secured the debt with a mortgage on all of said Lot 5. Wingen & Sons had a judgment against Gaul which was a lien on Lot 5, and it was sold on execution sale on October 12, 1940, to Chris Wingen for $338.60.

Carl Schultz procured a judgment against Gaul and wife on March 22, 1940, for $139.81 and costs, and on November 14, 1941, Lot 5 was sold at execution sale to Schultz. The Waukon State Bank procured decree of foreclosure of its mortgage on February 3, 1942, and Lot 5 was bid in by the bank at special execution sale on March 18, 1942, for $2,232.52. This was less than the judgment and a receiver was appointed.

Gordon Van Tine Company had a judgment lien against the lot for $250. Tax-sale certificates totaling $352 were outstanding against Lot 5, and also taxes of $103 for a single year were unpaid.

There was also a mortgage for $1,000 on Lot 5 held by Frances Smith, a sister of Mrs. Gaul. This mortgage was apparently fictitious. The defendant Mary E. Collins said she talked to Frances Smith and Mrs. Grossman, her mother, and they told her there was no consideration for the mortgage and Mrs. Smith had given Gaul a release of it. Arthur Sheridan

also held a mortgage of $500 on Lot 5, which Mary E. Collins also testified that Sheridan told her had been released.

There were liens against Lot 5 in the late fall of 1940 in excess of $3,500. The Gauls had left the state and Mrs. Ida Collins, the mother, testified that since they had been to some expense and work in trying to sell the place, and the Gauls had listed it for sale to others, they made Gauls an offer of $300 for Lot 5. She then proposed to Dee, the plaintiff, that he buy the middle portion, which he was occupying, for $1,800. Dee testified that Mrs. Collins told him to have a down payment of $300 ready so that she could take up the Gaul deed when it came. Gaul sent a deed in blank to Lot 5 to the Kerndt bank, with an assignment of the Smith mortgage, also in blank, and a release of the Sheridan mortgage. On November 25, 1940, Dee paid Mrs. Ida Collins $300 and received the following receipt:

"Waukon, Ia. Nov. 25th, 1940
Received a Cert. of Deposit for $100.00 and also a check for $200.00 to turn over to Kerndt Bros. Bank on payment on new house on Gaul property, the lot of 120 feet facing on Williams St.

[Signed]  Ida R. Collins."

The Collins family received the Gaul deed on December 8, 1940, and inserted therein the name of the defendant Robert A. Collins, as grantee, although his mother testified that his financial responsibility was quite limited. Mrs. Collins testified that the Smith assignment and the Sheridan release were not delivered to them.

Thereafter Mrs. Collins and Cletus E. Dee, the plaintiff, went to the office of F. E. Teeling, his attorney, who prepared a written contract between Robert A. Collins as seller and Dee as purchaser of the middle 122 feet of said Lot 5, together with an easement for driveway purposes on the east 12 feet of the south 183 feet of Lot 5 to Bradley Street. The consideration was $1,800, payable $350 in cash (the $50 paid as rent and the $300 paid on November 25, 1940), and the balance of $1,450 by a note for $1,000, due in five years, with interest at five per

cent, secured by a first mortgage on the land purchased, and a note for $450, payable in three years, with interest at four per cent, secured by a second mortgage on the land, with the privilege of making payments of $10 or any multiple thereof on the first day of any month before the notes became due. The purchaser was to pay the taxes for 1941 and subsequent years. Under the contract Robert A. Collins, the vendor, within fifteen days from the date of the contract, was to convey to Cletus E. Dee "by good, sufficient and valid Warranty Deed" the premises purchased "free and clear of any and all liens, encumbrances and clouds on the title and to furnish purchaser proper abstract of title on the said premises certified down to date of delivery of such deed and showing good merchantable **title in** said premises." Collins was also "to have said premises properly surveyed and platted and proper official plat thereof **recorded.**" He was to pay all taxes and assessments, including those for the year 1940 payable in 1941.

The contract was executed and acknowledged by both parties on December 11, 1940, and was filed for record on February 15, 1941.

Mrs. Collins testified that all of Lot 5 was worth about $4,000 at this time and about half of that value was in the part sold to Dee. Robert A. Collins took title subject to all liens and encumbrances.

Mrs. Ida Collins testified:

"After the agreement was signed I talked with Dee about the first of January [1941]. Well, Cletus asked me when we would have the papers ready for him to sign and I told him that day that I wasn't getting any place with the claims, that Neubauers weren't going to refinance and pay the Waukon State Bank as the contract he had, that Neubauer had gone and that it looked as if we couldn't do much. * * * I told him *if* we couldn't get it fixed we would give him back his money or rent, whichever he preferred. He said he had to have some place to live."

The last sentence is the only expression from Dee shown in the record which can be cited by the defendants on their claim of Dee's abandonment of **the contract.**

Mrs. Collins also testified that later Robert Collins "went to McGregor and made arrangements for a loan on the house Cletus wanted for $1,450, and Cletus refused to accept the deed with the McGregor loan on it. He said he would finance it himself."

It seems highly improbable that, with all of Lot 5 already encumbered for almost $4,000, Robert Collins, who, as his mother testified, had no financial responsibility, could arrange for a further loan of $1,450 on a part of the lot.

The plaintiff testified, and there is no evidence to the contrary, that Robert Collins, Mary E. Collins, nor any of the Collins family, ever tendered to him a warranty deed, or a deed of any kind, or an abstract showing a merchantable title free and clear of all liens and encumbrances. Robert Collins in his answer concedes that under the contract he was to convey good title to Dee, and avers that "at all times he acted in good faith and made every effort to carry out the provisions of his contract." His defense, or one of his defenses, is that he was unable to give good title, and that, because of an oral side agreement with Dee, he was thereby absolved from complying with the contract.

His codefendant, however, in her verified answer alleged that, "This defendant after obtaining title to the real estate involved paid off all prior claims and liens and obtained good title to the real estate by the redemption of numerous judicial sales and the arrangement to take care of tax sale of said premises," but she further alleged that she "is an innocent purchaser for value" and is not bound by her brother's contract.

The truth of the matter is, as the record definitely shows, that it is the Collins family, and not any single member of it, that is involved in this transaction. In the beginning the Gaul deed was lifted from the Kerndt Bros. Bank, not by Collins' money, but by money paid by Dee. After this use had been made of his money they seemed to-lose interest in him, and within twenty days after the contract was signed and Dee asked them when the settlement papers would be ready, Mrs. Collins told him "that it looked as if we couldn't do much" about the

title, and if "we couldn't get the title in shape, the rent would have to be more than what he had been paying." Several of the family claim to have put money into the deal. Catherine Collins testified, concerning the Wingen, Schultz, and Van Tine judgments:

"The Wingen [judgment], I sold a car which my brother gave me when he went into the army. Together my brother Tom and I paid up the judgments, the Schultz and Van Tine claims. I borrowed money and signed a note from Mr. Richter to pay up the Van Tine and part of the Schultz."

Mrs. Ida Collins testified:

"There was a tax sale outstanding at the time the contract was signed [the Dee contract]. *Some member of the Collins family* bought it. It was $352."

Mary E. Collins testified:

"When *we* paid *our* money the deed was sent over * * *. *We* didn't get *our* deed until the 8th of December [1940]. The only way *we* could clear up the title so to [get] deed and get rid of the mortgages was to buy the assignment and take sheriff's deed * * * *We* tried to get title so Bob deeded to *me*. He told me to put my money in it and save the rest of the property, if I would invest in it."

She testified that she received a deed from Robert to the entire tract during the month of March 1942. It was not a matter of her investing money and then getting a deed. The money which the family expended in removing the liens was all paid long after March 9, 1942, the date of the deed to her. The Schultz judgment was paid November 14, 1942, in the sum of $194.37. The Waukon State Bank certificate of sale was taken up on March 6, 1943, by payment of $2,436.97. The Van Tine and Wingen judgments were paid after December 9, 1942. The tax certificates were taken up in December 1942. The deed from Robert to Mary E. Collins was not recorded until November 14, 1942. She testified:

"I have been familiar with this deal all the way through since the time Bob obtained title from the Gauls * * * I knew

at all times that Mr. Dee was in possession of the property. He was in possession of the property when I got my deed. The contract was on record at the time I got my deed and was of record at the time I recorded my deed. * * * I remember testifying before Judge Goheen here on a hearing in a receivership. That was on March 30, 1942.''

Her testimony at that hearing and her testimony in the trial of this case cannot be reconciled. The receiver had made an application to the court to approve an agreement he had made with Dee for the latter to pay a rental of $17 a month for the property occupied by Dee, being the property here in controversy. To this application an objection was filed that the rent was not enough and that the objector would pay more. The objections were signed:

"Robert A. Collins
Objector.
By Mary E. Collins, Attorney in fact.''

Cletus Dee filed a resistance to the objections, alleging his contract of purchase from the objector and his continuous occupancy of the property under the contract at all times since its execution. He attached a copy of the contract to his resistance.

The objector then filed an answer to the resistance, alleging that the resistance showed that Dee was not relying upon the contract for possession but upon a lease with the receiver. This answer is signed, ''H. Haehlen, Attorney for Robert A. Collins.''

As a witness at this receivership hearing Mary E. Collins testified in substance that she had a power of attorney from Robert A. Collins to look after his interests at the hearing; that he had a right of redemption for a year to redeem it from the bank; that he had given Dee a contract of purchase; that he intends to clear up the property and finance it and go through with the contract; that he is going to clear up the title:

''Q. But what I am getting at, your brother still maintains that he intends to fulfill the contract? A. Yes. Q. Is it your claim you owned that property on March 8? A. *I said Bob*

*gave me a deed.* Q. You claim you owned it on March 8? A. *I said Bob gave me a deed on March 8.* \* \* \* if we wanted to go ahead and save what we put in it, and invest my money to go ahead and do it. \* \* \* Q. But then on March 30, 1942 you did claim to have been the owner of it? A. *I hadn't got the deed yet.* I hadn't made up my mind to put the money in it, but I did.'' (Italics ours.)

The court approved the application of the receiver.

The Collins family had some negotiations with the Waukon State Bank about taking an assignment of its sheriff's certificate. On about the last day before the expiration of the period of redemption for junior lienholders A. T. Wendel, an uncle of Dee, took an assignment of the certificate from the bank. The Collins heard of this. Mary E. Collins testified:

''Mother and I went to see Mr. Wendel, and told him if he really wanted the property we would sell the whole thing and he could make his deal with Cletus. He said he wasn't interested in it.''

Mary and her mother recognized at that time that Dee had not abandoned his contract, but they were willing to breach that contract and put it out of their power to perform it by making a new contract with Wendel.

Further evidence that Dee had never abandoned his contract appears from the testimony of Mrs. Ida Collins that, ''in July or August 1941 he offered us $150 for a deed to the entire tract.'' He was willing to assume all of the liens (which had increased since they bought it) and make them whole on the deal (they had been collecting rent from the rest of the property) in order to get the property he had agreed to purchase. He at all times claimed the property under his contract. Under it his rights were junior to all of the lienholders. He paid rent to the receiver because of that fact—$198.10 in cash and $22.90 in repairs and labor on the property. In determining the final amount he must pay on the contract he should receive credit for the cash rental which he paid. He at all times remained in possession, either in person or by his tenant. He never paid

or offered to pay rent to any member of the Collins family, although Robert at one time demanded $25 a month rent.

Appellees contend that the fact that appellant did not pay the taxes for 1941 or thereafter indicates that he had abandoned the contract and the property. They make a similar claim because he asked for no homestead exemption. There is no merit to either contention. Under the contract the vendor was to have the property properly surveyed and platted and the plat recorded. Appellant's testimony that this was never done was not disputed.

Mrs. Collins, over proper objection, willingly offered testimony which was a conclusion, hearsay, and not the best evidence, that the county treasurer had apportioned the taxes for the homestead exemption. Later, on cross-examination, she was asked, "To your knowledge neither Bob nor Mary Elsie [Collins] ever had that property platted or the taxes apportioned?" and she replied, "No, I don't think so."

Lot 5 at all times was assessed and taxed as a single tract, and it was impossible for appellant to claim a homestead exemption on an indefinite tract or to pay his tax without paying the entire tax.

When the trial was begun before Judge Eichendorf on September 28, 1943, appellant tendered into court the balance of the contract price in the sum of $1,229, in cash, and also notes and mortgages in the same amount, as provided in the contract. That tender, increased by the proper amount of interest as required by this court on the first appeal, has been kept good ever since. He has offered to do more than his contract required. He gave them a choice between cash or secured paper. The evidence establishes that he has always been ready, able, and willing to perform his contract, and has never been in default, and that the appellees, or either of them, have never by a proper tender placed him in a position to be in default. Though Mary E. Collins contends that she has paid all liens on the land, she has never offered to perform and contends that she is under no obligation to do so.

The plea of abandonment of the contract is an affirmative defense (Allbright v. Hannah, 103 Iowa 98, 102, 72 N. W. 421)

but the appellees, or either of them, have fallen far short of establishing it. They offered hearsay testimony of an immaterial so-called admission of Mrs. Dee and of one Martin, but neither is of any probative value nor binding upon the appellant. By a very leading question one Fahey was induced to say that appellant said he owned all of Lot 5. By their evidence the appellees have proved too much. It corroborates the evidence of appellant that there never was any abandonment of the contract.

II. The appellees have also failed to show that appellant was in court with unclean hands. Instead, the record establishes that it is the conduct of the members of the Collins family which is open to justifiable criticism. They knew that they could go to the office of the clerk of the court and make redemption from all of the execution and tax sales. But instead they were attempting to get assignments of the certificates. Their purpose was, as they claimed, to cut off certain fictitious mortgages by getting sheriff's deeds. Appellant's attorney was fearful that in doing so they might also cut off appellant's rights under his contract, and he advised him to get his father or other relatives to procure assignments of the certificates. He could not redeem his particular purchase because Lot 5 was sold as a whole at each execution sale. His father and his uncle procured three of these certificates. They had no ulterior purpose in doing so. They merely wished to protect the appellant in the only way they thought they could. Although Mrs. Collins testified that "in each one of these sales, when they got ready to buy up the certificate, they found they had been assigned or transferred to some of Dee's relatives," the appellees were in no way injured. They simply then went on and redeemed. Appellant had an interest in the property which he had a right to protect in any proper way. There is no evidence nor any reasonable inference that he contemplated injuring the appellees in any way. Neither party to the contract could by procuring assignment of certificates or by redemption absolve himself from his obligations under the contract or defeat the rights of the other contracting party. See McCreary v. McGregor, 183 Iowa 732, 167 N. W. 633; Blotcky v. Silberman, 225 Iowa 519, 281 N. W.

496; Cowdry v. Cuthbert, 71 Iowa 733, 29 N. W. 798; Stinson v. Richardson, 48 Iowa 541. There is no merit to this alleged defense.

III. There is another matter referred to on the first appeal. Mrs. Ida Collins, in her effort to defeat appellant's rights under the contract and to drive him from the property, shut off the city water pipes. She testified:

"The water and sewer is furnished through the house on the pavement. At the time Mr. Gaul built the house on the north [the Dee house] he connected it up with the new house [on Bradley Street], but *there was no privilege given.*"

The appellant moved to strike all of the italicized words as an opinion and conclusion and not binding on the appellant.

Continuing, Mrs. Collins testified:

"When the property was under receivership I drove up there and it was 18 below zero, the house was vacant and the water was on. That was one of the reasons why *we* had the water disconnected. The water was cut off in the lower house, and there was nothing done on the portion of the lot Cletus claimed under the contract."

The weakness of this explanation is that the pipes withstood the "18 below zero" weather, and it was not until after Mrs. Collins was defeated in L. T. Hermanson's justice court, in a forcible-entry-and-detainer case that she had brought against Mrs. Dee, that Mrs. Collins called the plumber to do the pipe plugging, on April 15, 1943. Mrs. Collins testified:

"Q. It wasn't 18 below zero when you shut off the water? A. When I made up my mind to shut it off. Q. That was pretty nice weather when you shut it off? A. When I got the plumber."

The shutting off of the city water not only cut off the water supply thereby furnished but also deprived them of toilet and sewer facilities, and as we understand, that deprivation has continued. When the contract was made the water and sewage facilities installed and connected with the property purchased were a part of that property, and the appellant was entitled to the property in the condition it was when the contract

was made. He was entitled to have the property remain in that condition free from any wrongful interference by the appellees or their mother, Ida Collins, or anyone acting for them. It is our conclusion from the whole record and from the dominion and control exercised by Mrs. Ida Collins in shutting off the water in the Dee property that she has an interest in the property and is a real party in interest. On the remand of this case to the district court it is directed by proper order or decree to restrain the appellees from further interference with or damage to all pipes and other instrumentalities used to supply water and sewage facilities to the property described in appellant's contract, and to compel the appellees, without expense to appellant, to repair or restore the pipes and other instrumentalities which were plugged, cut off, or rendered of no service, to such condition as they were in at and prior to the time the said wrongful plugging, stopping, or cutting off was done; and if the said order of repair or restoration is not complied with within the time specified by the court that the appellant be authorized to have it done and to deduct all expense thereof from the purchase price of the property.

The district court is further directed to render decree granting the appellant such other relief as prayed for, and such other relief as he may be entitled to not inconsistent with this opinion.

The decree is—Reversed and remanded with directions as noted.

MILLER, OLIVER, HALE, GARFIELD, MANTZ, and MULRONEY, JJ., concur.

SMITH, J., takes no part.

WENNERSTRUM, J., not sitting.